■ Marie Parziale Johs, as Administratrix of the Estate of Vincent Parziale, Sr., Deceased, et al., Respondents-Appellants, v P.G.S. Carting Co., Inc., et al., Appellants-Respondents, et al., Defendants. [837 NYS2d 676]—

In an action, inter alia, to recover damages for breach of contract, the defendants P.G.S. Carting Co., Inc., Joseph Parziale, and Joseph Spada appeal from a judgment of the Supreme Court, Suffolk County (Emerson, J.), entered July 29, 2005, which, upon a decision of the same court dated April 25, 2005, made after a nonjury trial, is in favor of the plaintiff Marie Parziale Johs, as administratrix of the estate of Vincent Parziale, Sr., and against the defendants P.G.S. Carting Co., Inc., and Bay Village Disposal Corp., in the principal sum of $216,766.83, and the plaintiffs cross-appeal, as limited by their brief, from the same judgment, on the ground of inadequacy.

Ordered that the appeals by the defendants Joseph Parziale and Joseph Spada are dismissed, as those defendants are not aggrieved by the judgment appealed from (see CPLR 5511); and it is further,

Ordered that so much of the appeal by the defendant P.G.S. Carting Co., Inc., as is from the judgment insofar as against the defendant Bay Village Disposal Corp. is dismissed as the defendant P.G.S. Carting Co., Inc., is not aggrieved thereby; and it is further,

Ordered that the judgment is reversed insofar as it is against the defendant P.G.S. Carting Co., Inc., on the law and the facts, the judgment is vacated insofar as it is against the defendant Bay Village Disposal Corp., and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings in accordance herewith; and it is further,

Ordered that one bill of costs is awarded to the defendant P.G.S. Carting Co., Inc., payable by the plaintiffs.

When Vincent Parziale, Sr. (hereinafter the decedent), died on January 1, 1986, he was, along with the defendants Joseph Parziale and Joseph Spada, an equal owner of the defendant P.G.S. Carting Co., Inc. (hereinafter PGS), a waste-hauling business operating in Nassau and Suffolk counties. Upon his death, the decedent's shares passed to his estate. The plaintiff Marie

Parziale Johs (hereinafter the administratrix) is the decedent's daughter as well as a beneficiary and the administratrix of his estate. The remaining plaintiffs are the decedent's other surviving children who are also beneficiaries of his estate. On May 25, 1991, the estate and the decedent's surviving children entered into a stock purchase and settlement agreement with PGS (hereinafter the agreement). Under the agreement, PGS and the defendant Bay Village Disposal Corp. (hereinafter Bay Village) (hereinafter collectively the defendants) agreed to purchase the estate's one-third interest in PGS for the sum of $900,000. After a $225,000 cash down payment, the balance of $675,000 was made payable over 10 years (beginning May 25, 1991) in 120 equal monthly payments pursuant to a promissory note bearing a 9% annual interest rate.

With regard to the possibility of a municipal takeover, the agreement provided as follows:

"[¶ 2] (b) In the event of a municipal takeover resulting in the termination, in whole or part, of the routes of [PGS], [PGS] shall have no further obligations to make payments to the Estate [pursuant to the promissory note] from that date forward, provided all payments are current to that date, except as follows:

"(i) In the event of a termination 'in whole', if [PGS] or [its] stockholders shall within ten (10) years from the date of this Agreement thereafter be the recipients of a municipal contract with the municipality in which the takeover occurs for the commercial collection of garbage . . . the balance of the payments due to the Estate pursuant to this Agreement shall continue until fully discharged in accordance with all the terms and conditions of this Agreement, except that such payments shall be reduced in each year thereafter where the gross income realized by [PGS] . . . is less than the sum of $2,500,000.00. In that event, if the gross income for any given year is less than 90% of the sum of $2,500,000.00, the payments for that year shall be adjusted proportionately to reflect the differential between the sum of $2,500,000.00 and the gross income realized for such year. In making this assessment and calculation, it is understood that the percentage differentials, if any, cannot logically be determined until the end of each fiscal year and, accordingly, any adjustments that may be necessitated can be offset by [PGS] in an equal monthly amount during the ensuing 12 months. Should any adjustment be necessary during the tenth and last year of payments, any such sums will be reimbursed, as appropriate, by the Estate or [PGS] . . . or the stockholders, as the case may be. . . .

"(ii) In the event of a termination 'in part', [PGS] shall not be relieved of any of [its] payment obligations to the Estate unless by reason of the partial termination[,] the gross income for any subsequent year thereafter realized by [PGS] or the stockholders, as the case may be, is less than $2,500,000.00, regardless of whether [PGS] or their stockholders shall thereafter be the recipients of a municipal contract. If the gross income for any given year is less than 90% of the sum of $2,500,000.00 by reason of a partial termination, the payments for that year shall be adjusted proportionately to reflect the differential between the sum of $2,500,000.00 and the gross income realized for such year. In all other respects, the provisions of paragraph 2[(b)] (i) of this Agreement shall apply to a partial as well as to a whole, termination."

Effective January 1, 1996, a municipality partially took over PGS's waste-hauling routes. As a result, beginning that year PGS's gross income fell below 90% of $2.5 million. Through January 25, 1996, PGS had made 57 timely note payments and owed a principal balance on the note of $428,047.06. It made no additional monthly payments after that date.

The agreement also contained the following provision at paragraph 2 (b): "(iii) Regardless of whether the termination be 'in whole' or 'in part', if there are any monies realized by [PGS] by reason of any sale of [PGS's] assets, condemnation, liquidation, litigation, or otherwise, such monies shall be distributed pro rata in accordance with the formula set forth in paragraph 14 (s) of this Agreement, and all such sums shall be credited against any monies which may be due and owing to the Estate."

Paragraph 14 (s) provided in pertinent part as follows: "in the event that [PGS] makes any distribution of profits or assets of [PGS] . . .to its shareholders while the Stock is being held in escrow, then the amount of such distribution as equals the proportion of the Stock then held in escrow to the total issued and outstanding shares of [PGS] at the time this Agreement is executed shall be paid to the Estate in payment of the next installment (s), if any, due from [PGS], such payments not to exceed the balance of the purchase price for the Stock, if any, and any interest due and owing thereon."

On June 1, 1999, PGS sold its assets to the defendant South Shore Waste Corporation (hereinafter SSWC) for the sum of $1.5 million, and the defendants Parziale and Spada contemporaneously entered into separate consulting agreements with SSWC, with their compensation included in the PGS sale price.

On June 14, 1999, PGS tendered to the plaintiffs the sum of $216,240. PGS asserted that this amount was the balance due

under the agreement including 9% interest. The plaintiffs rejected that tender as inadequate.

In November 1999 the plaintiffs commenced this action in the Supreme Court, Suffolk County, to recover damages, inter alia, for breach of contract. At the conclusion of discovery, the court granted the plaintiffs partial summary judgment as to damages under the agreement, awarding them a conceded principal balance of $175,443.51 plus $79,397.12 interest, for a total award of $254,840.63. The defendants remitted that amount to the plaintiffs on November 14, 2000.

On April 25, 2005, following a five-day nonjury trial of the remaining issues in the case, the court found that the agreement was unambiguous and that the defendants had breached it on February 25, 1996, when they missed the payment due on that date, and, after considering adjustments and credits based on the partial municipal takeover and PGS's sale of its assets, the court awarded the plaintiffs an additional sum of $216,766.83 (comprised of the principal balance and accumulated interest) plus additional interest calculated as of the decision date. The court also held that, because the plaintiffs had not exercised their right under the agreement to accelerate the balance due following PGS's failure to make payments after January 1996, they were only entitled in the ensuing period to receive monthly payments from PGS as they became due.

Computing the plaintiffs' damages, the court found that on the effective date of the partial municipal takeover of PGS (January 1, 1996), PGS had been current on all note payments. Accordingly, the reduction formula set forth in paragraphs 2 (b) (i) and (ii) of the agreement became effective. The court accepted the defendants' figures for PGS's gross income from 1996 through 2001, which the plaintiffs do not dispute on appeal. In applying the formula, the court explained that paragraph 2 (b) (i) states that percentage differentials cannot be determined until the end of each fiscal year, and thus, any reductions are applied in the 12 months following the year in which the reduced income occurred. In other words, although PGS's income fell below 90% of $2.5 million for 1996, it was still required to make full payments for all of 1996, with reductions based on PGS's 1996 gross income not to begin until January 1997.

Further, in June 1999, PGS received the sum of $250,000 from SSWC, and from July 1999 to April 2001, it received the monthly sum of $14,895.84 from SSWC. The court found that the estate was entitled to 15% of these payments ($37,500 in June 1999, and $2,234.38 each month from July 1999 to April

2001), which was the percentage of the estate's PGS shares then held in escrow. The court's accounting charged PGS for these sums plus interest. The court used 15% of the June 1999 payment from SSWC to credit PGS but did so only for the one installment due on June 25, 1999, without carrying over the excess credit to the ensuing months until the credit would be exhausted. Between June 1999 and April 2001, the only other funds owed to the estate were the monthly note payments pursuant to paragraph 2 (b) (ii), and accordingly, the court credited PGS for "the amount of each monthly [asset sale] payment due on the first of the month [from SSWC to PGS] against the corresponding [reduced note] payment due on the twenty-fifth of the month [from PGS to the estate]."

After considering the above factors, the court found that the plaintiffs incurred damages in the sum of $471,607.46, which included the principal balance on the note and accrued interest. The court then credited the defendants for the $254,840.63 payment they made in November 2000, resulting in an award to the plaintiffs of $216,766.83, plus additional interest from the date of the decision to the entry of judgment. PGS, Parziale, and Spada appeal and the plaintiffs cross-appeal from the judgment, challenging certain of the court's calculations.

The trial court determined, and the parties do not contest before this Court, that the contract was unambiguous. "[W]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties . . . so that their reasonable expectations will be realized" (Matter of John E. Andrus Mem. Home v DeBuono, 260 AD2d 635, 636 [1999]; see also Singh v Atakhanian, 31 AD3d 425 [2006]; Joseph v Creek & Pines, 217 AD2d 534, 535 [1995]).

Paragraph 2 (b) (i) provides, in pertinent part, that with respect to the reduced note payments resulting from a municipal takeover, "[s]hould any adjustment be necessary during the tenth and last year of payments, any such sums will be reimbursed, as appropriate, by the Estate or [PGS] . . . as the case may be." However, in its calculations, the trial court only considered PGS's reduced monthly payments based on PGS's 1996 through 2000 income, without considering the reimbursement, if any, which PGS was entitled to receive from the estate based on its 2001 income. We find that based on PGS's 2001 gross income, it was entitled to a reimbursement in the total sum of $1,208.54, applicable toward the principal balance it owed on the note, for note payments it would have made from January 2001 through April 2001. Moreover, the reduced note

payments PGS was entitled to make from January 1997 through April 2001 reduces the principal balance that PGS owes the plaintiffs by the sum of $122,696.13 for which the court credited PGS for all but $1,208.54 thereof.

Further, the trial court erred in calculating the credit due PGS resulting from its June 1999 sale to SSWC. The pertinent language of paragraph 14 (s) provides that the pro rata distribution, which is based on the percentage of the estate's shares in PGS held in escrow at the time of the sale of assets (15%), "shall be paid to the Estate in payment of the next *installment(s)*" (emphasis added). Paragraph 2 (b) (iii) provides that all monies "realized" by PGS from, inter alia, a sale of its assets, "shall be credited against any monies which may be due and owing to the Estate." Taken together, these provisions indicate that the parties intended that the credits to which PGS was entitled could extend to more than one installment payment on the note. The trial court, however, credited PGS only for the corresponding note payment in June 1999, the month that PGS received monies from SSWC. The estate's 15% share of the monies PGS realized from the sale of its assets was $37,500 on June 1, 1999, and an additional $49,156.36 between July 1, 1999, and April 1, 2001, with which sums plus interest the court in its calculations had charged PGS. In consideration of the foregoing and because the agreement provides that the credits cannot exceed the balance and any interest due and owing to the estate, the total credit applicable toward the principal balance PGS owed to the estate is $43,981.37.

Further, in the October 2000 order granting the plaintiffs partial summary judgment, the Supreme Court, inter alia, awarded the plaintiffs the sum of $254,840.63, of which $175,443.51 reduced the principal balance PGS owed to them, while $79,397.12 was applied to interest. The trial court acknowledged that PGS remitted the above award to the plaintiffs on November 14, 2000. Nevertheless, in calculating the plaintiffs' damages, the court did not credit PGS for that November 2000 payment until after it had calculated the principal balance and interest due and owing on the note through April 2005, thereby assessing PGS interest on sums it had remitted over four years earlier.

In summary, upon remittal, the Supreme Court must recalculate the damages, if any, that the defendants owe after (1) giving effect to a reduction for the payments to have been made in 2001 based on reduced corporate income in that year, (2) allowing the defendants additional credit for the $37,500, representing 15% of the payment received in June 1999 from SSWC

spread over the installment due that month and over the ensuing installments until the credit was exhausted, and treating the monthly installments attributable to the plaintiffs' 15% stock interest or the sum of $2,234.38 per month as a credit against any remaining note installments not to exceed credits up to the balance plus interest due pursuant to paragraph 14 (s) of the agreement, and (3) crediting against principal due and contract interest accrued thereon as of November 14, 2000, the sum of $254,840.63 which the defendants paid on that date pursuant to the order granting partial summary judgment to the plaintiffs. In making all of its calculations, the Supreme Court must calculate interest from the date each installment, if any, was due (*see Rogowsky v Lewis*, 20 AD3d 465, 466 [2005]), because the plaintiffs refrained from accelerating the balance.

We also vacate the judgment insofar as it is in favor of the administratrix and against Bay Village in the principal sum of $216,766.83, since that relief is inextricably intertwined with the judgment insofar as against PGS (*see Matter of Burk*, 298 NY 450, 455 [1949]; *Wheeler v Buxton Indus. Equip. Co.*, 292 AD2d 521, 523 [2002]; *Foley v Roche*, 68 AD2d 558, 564-565 [1979]).

The plaintiffs' contentions concerning inadequacy are without merit. Schmidt, J.P., Crane, Skelos and Fisher, JJ., concur.